**FIRST DIVISION**
**DOYLE, C. J.,**
**ANDREWS, P. J., and RAY, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 15, 2016**

# In the Court of Appeals of Georgia

A16A0338. BABBITT v. THE STATE.                                    DO-012 C

DOYLE, Chief Judge.

After a jury trial, Armand Babbitt was convicted of two counts of aggravated assault,[1] possession of a firearm by a convicted felon,[2] and possession of a firearm during the commission of a felony.[3] The jury acquitted Babbitt of two counts of felony murder (one count predicated on aggravated assault and one count predicated on armed robbery) and of armed robbery. Babbitt appeals, arguing that (1) the trial court erred by excluding his pre-trial statement but allowing its use for impeachment purposes; (2) the evidence was insufficient to support his conviction for aggravated

---

[1] OCGA §§ 16-5-21 (b) (2).

[2] OCGA § 16-11-131 (b).

[3] OCGA § 16-11-106 (b) (1).

assault because it is inconsistent with the jury's acquittal on the charges of felony murder and armed robbery; and (3) the evidence was insufficient such that the trial court should have found that the guilty verdict was against the weight of evidence. For the reasons that follow, we affirm.

"Viewed in the light most favorable to the verdict,"[4] the record shows that on June 4, 2010, Felipe Brito, who spoke little English, arranged to sell cocaine for $29,000 to some men with the assistance of Miguel Bautista as a translator. Bautista arranged to have the buyers (later discovered to be Tremain Davis, Babbitt, and a third man) meet him at a local TGI Fridays restaurant from which location the buyers followed him in their vehicle to an apartment complex where Brito lived.

When Bautista and the buyers arrived at the complex, Brito exited his apartment and waited at his truck where he had the drugs. Brito sat in the vehicle with the three men, and then signaled to Bautista when the transaction was complete. Bautista then took the drugs to the vehicle, but Babbitt's co-defendant, Davis, forced Bautisa into the backseat of the vehicle beside Brito. Davis got into the backseat beside Brito and Bautista, and Davis, Babbitt, and the third man demanded at

---

[4] *Davis v. State*, 296 Ga. 126, 127 (1) (765 SE2d 336) (2014), citing *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2

gunpoint both the drugs and the money. At some point, two of the three buyers opened fire on Brito and Bautista, killing Brito and injuring Bautista as Bautista pushed Brito out of the vehicle.

Cell phone records obtained from that day show that Bautista made several calls to a number to which Babbitt was also making multiple calls; on the day of the incident, Babbitt's cell phone was using the cell tower located close to the apartment complex where the shooting occurred; and Babbitt was apprehended with Bautista's cell phone number in his wallet.

The jury returned a guilty verdict as to the two counts of aggravated assault and two counts related to possession of a weapon.[5] Babbitt thereafter filed a motion for new trial, which was denied by the trial court. This appeal followed.

1. Babbitt first argues that the trial court erred by excluding his pre-trial statement but allowing its use for impeachment purposes, which precluded him from presenting an alibi defense.

(a) After a hearing on Babbitt's and the State's motions in limine regarding Babbitt's pre-trial statement to investigators, the trial court ruled that the statement

[5] The State tried Babbitt separately from his co-defendant, Davis. The Georgia Supreme Court affirmed Davis's conviction of felony murder and two counts of aggravated assault in *Davis*, 296 Ga. at 126.

was not admissible in the State's case-in-chief because Babbitt had not been read his rights pursuant to *Miranda v. Arizona*.[6] It is undisputed that Babbitt was provided no warnings prior to providing a statement to the district attorney's office. Nevertheless, even if a statement cannot be admitted in order to establish guilt because it violates the prophylatic rule enunciated in *Miranda*, it is possible to admit such a statement for purposes of impeachment.[7] In order for such statements to be admitted for impeachment purposes, the trial court first must ascertain whether the statements were voluntarily made, even if the procedural safeguards of *Miranda* or invocation of the defendant's right to an attorney were violated.[8]

> In other words, confessions may be ruled inadmissible on the merits for either failure to follow procedural requirements, or on traditional pre-*Miranda* standards of voluntariness. If inadmissible for

---

[6] 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[7] See *Harris v. New York*, 401 U. S. 222, 226 (91 SCt 643, 28 LE2d 1) (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that [the defendant's] credibility was appropriately impeached by use of his earlier conflicting statements."). See also *Alexander v. State*, 138 Ga. App. 618, 619-620 (2) (226 SE2d 807) (1976), citing *Colbert v. State*, 124 Ga. App. 283 (183 SE2d 476) (1971).

[8] See *Green v. State*, 154 Ga. App. 295, 297-298 (1) (B) (267 SE2d 898) (1980).

procedural defects, with no indication of traditional involuntariness, the confession may be used for impeachment. If inadmissible because not voluntarily made, a confession may not be used for impeachment.[9]

OCGA § 24-8-824[10] renders a defendant's confession inadmissible if it was induced "by the slightest hope of benefit. . . ." Thus, in order to determine whether Babbit's statement was voluntary in order for impeachment purposes, the trial court was required to determine whether Babbitt made it with a hope of benefit. After a hearing on the matter, the trial court found that Babbit's video-taped statement was admissible for impeachment purposes because it was voluntarily made without hope of benefit.

Babbitt contends that this finding was erroneous because he believed based on the assertions of his first trial counsel and the State that giving a statement would result in reduced or dismissed charges. The transcript of the hearing on the motion in limine addressing the admissibility of Babbitt's statement shows that the investigating officer denied offering Babbitt hope of benefit, threatening him, coercing him,

---

[9] (Punctuation omitted.) Id. at 298.

[10] Formerly OCGA § 24-3-50 (2012). This case was tried after January 1, 2013, therefore the New Evidence Code applies. See Ga. L. 2011, p. 99, § 2, 101/HB 24.

5

making promises to him, or discussing with him a plea deal of any kind, but he admitted that Babbitt was in custody and may have been handcuffed at the time.

One of Babbitt's attorneys at the time, Miriam Arnold-Johnson, testified that she discussed the case with the assistant district attorney, Tana Brackin, and Arnold-Johnson was presenting Babbitt to speak with the State in order to move the case along "so that they could ascertain what it is he knew in order to be able to then make an offer." Arnold-Johnson testified that because Babbitt was not *Mirandized*, she had no red flags about the questioning, and "at that point we [were] proffering basically what he knew in an effort to try to see if we could, you know, negotiate a resolution. But there was always — and I believed from my discussions with Mr. Babbitt that we were doing that to reduce his sentence, to reduce his charge . . . ." Arnold-Johnson testified that she spoke with Babbitt about her negotiations with Brackin, explaining to him that if he could "fill in some of [the] gaps[,] then that would definitely help him out with whatever recommendation that they would be making if he were to enter a plea. . . . [to negotiate an offer to try to resolve it]." Arnold-Johnson and Babbitt's other attorney were attempting to get him a ten-year sentence and to get rid of the murder charge based on their discussions with Brackin. Arnold-Johnson testified that although there was not a definitive plea on the table, it was her impression that this

6

statement would not be used against him under any circumstances and that depending on what information Babbitt could provide, consideration as to charges and sentencing would be given, and Arnold-Johnson conveyed this to Babbitt.

Babbitt's other attorney during the time of the interview largely testified to the same — that Babbitt was being interviewed in order to ascertain precisely what plea offer the State would make, such that the interview was being done specifically for the benefit of a plea offer and would not be used in court against him.

Brackin, who left the district attorney's office a month after Babbitt's interview took place, admitted that these things were discussed in "preliminary" negotiations for a plea deal, but there was no offer made. Brackin maintained that Babbitt's attorneys, not the State, initiated the discussions. Brackin explained that

> I mean this was just a preliminary part of the negotiation. The whole idea was, you know, this was a proffer, this was — he's telling us what's going on. And the idea was, you know, we're going to go through, we're going to check out some of the stuff that he was telling us was going on. He wanted to make a plea[,] and we said we'd get back, you know, with an offer. That's the best of my recollection. Like I said, to my knowledge we didn't make an offer but we told him we would get back with one, we told his attorneys at least we'd get back with one.

7

Brackin clarified on cross-examination that the "preliminary negotiations" essentially were done because the parties "were trying to come to an agreement on a plea. We were hoping for a plea." Brackin testified to the following:

> [Question] What did you think in your own mind . . . was behind this person charged with murder . . . coming in to be interviewed by you . . . ?
>
> [Brackin] That he's decided [his alibi is] not a valid defense[,] and he wants to enter a plea.
>
> [Question] To what?
>
> [Brackin] To something else. To something less than.
>
> [Question] Less than what?
>
> [Brackin] Less than what he's charged with.
>
> [Question] Less than murder?
>
> [Brackin] Correct.

Brackin, however, testified that she never made a firm offer with a specific amount of time, and everyone involved in the case knew that she would be leaving

and not handling the case. Brackin could not remember whether anyone had *Mirandized* Babbitt prior to the interview, but she confirmed she had not; nevertheless, she testified she intended to use what he said against him at trial if it moved forward.

The supervising assistant district attorney, Stephen Fern, also stated that the State was involved in negotiations with Babbitt's attorneys in order to help Babbitt avoid felony murder charges and a mandatory life sentence, although Fern stated that defense attorneys initiated those discussions. Fern testified that prior to the interview, the State and Babbitt had a pretrial conference to discuss plea possibilities, which resulted in the interview. Fern testified that there

> came to be an understanding that he may be sentenced to something in the range or neighborhood of 30 to 40 years with a number of years on top of that to serve, so maybe a 60, serve 30 or 40, whatever ranges that were bandied about during these conversations. Nothing was committed to by either side with regards to this case, and that was sort of the impetus if you will for

the interview.

"The 'slightest hope of benefit' in [former] OCGA § 24-3-50 means the hope of a lighter sentence."[11] In this case, the evidence shows that the trial court erred by determining that Babbitt did not make the statements in the interview without the slightest hope of benefit for a lighter sentence that was brought about by discussions with the State.[12] There is no requirement that a specific plea or specific reduction are offered prior to statements being made by the defendant becoming subject to the hope-of-benefit rule. Although defense counsel may have approached the State initially, the testimony of Fern and Brackin confirm that the statement was made as part of plea negotiations and was not merely the product of the defendant's own mind or a tactical decision of defense counsel.[13] Accordingly, the trial court erred by allowing the statements for use as impeachment evidence.

(b) Babbitt contends that he was harmed by the trial court's error because he was prevented from presenting his alibi defense for fear that his statement would be used to impeach the defense. We disagree. Any error on the part of the trial court was harmless because the evidence he would have presented in support of his alibi

---

[11] *State v. Ray*, 272 Ga. 450 (2) (531 SE2d 705) (2000).

[12] See id. at 450-451 (2).

[13] See *Gray v. State*, 240 Ga. App. 716, 717-718 (1) (523 SE2d 626) (1999).

defense — family member's testimony that he was with them in another county removing debris from a foreclosed home — could not counter Bautista's identification of him as one of the gunmen; Babbitt's possession of Bautista's cell phone number; the cell phone records showing calls among his, Bautista's, and a third phone number on the day of the incident; or evidence that his cell phone was used in close proximity to the cell phone tower serving the apartment complex.

2. Babbitt also argues that the evidence was insufficient to support his conviction for aggravated assault because it is inconsistent with the jury's acquittal on the charges of felony murder and armed robbery

> As a general rule, a guilty verdict cannot be challenged on the ground that the jury's verdict of guilt on one count of an indictment is inconsistent with an acquittal on another count. Such verdicts are deemed constitutionally tolerable because they may reflect an exercise of lenity by the jury that is not necessarily grounded in its view of the evidence.[14]

"An exception to the inconsistent verdict rule exists when the appellate record makes transparent the jury's reasoning why it found the defendant not guilty of one of the

---

[14] (Citations omitted.) *State v. Springer*, 297 Ga. 376, 377 (1) (774 SE2d 106) (2015).

charges."[15] In this case, however, there were multiple shooters, and the fact that the jury acquitted Babbitt of felony murder and armed robbery does not "make transparent" their reasoning nor preclude Babbitt's conviction for aggravated assault against Brito despite the jury's acquittal of him for felony murder and armed robbery based on the shooting of Brito.[16] "[W]hile Georgia continues to recognize the rule against mutually exclusive verdicts, such rule applies to multiple guilty verdicts which cannot be logically reconciled; the rule is not implicated where, as here, verdicts of guilty and not guilty are returned."[17] The jury could have concluded that only Davis intended to rob Brito, and they could have determined that despite the

---

[15] (Punctuation omitted.) *Smith v. State*, 304 Ga. App. 708, 711 (3) (699 SE2d 742) (2010), overruled on other grounds by *Reed v. State*, 291 Ga. 10, 14 (3) (727 SE2d 112) (2012).

[16] Compare with *Muttalib v. State*, 335 Ga. App. 514, 516 (782 SE2d 300) (2016) (holding that judge's remarks in the record as to why evidence did not support conviction for one charge made transparent his reasoning, which was inconsistent with his finding of guilt for another charge, thereby warranting reversal of the judgement of conviction as to that second charge).

[17] *Artis v. State*, 299 Ga. App. 287, 293 (5) (682 SE2d 375) (2009). Compare with *Robinson v. State*, 334 Ga. App. 646, 652 (2) (780 SE2d 86) (2015) (reversing judgment of conviction in second trial, which should have been barred based on jury's acquittal of the defendant for crimes based on party-to-the-crime theory and the State's failure to present an alternative theory to support the defendant's conviction during the second trial for charges on which the initial jury failed to return a verdict).

instructions regarding conspiracy that Babbitt should not be held responsible for Brito's murder, but that because Babbitt was firing a weapon he should be held responsible for the aggravated assault of Brito. Accordingly, this enumeration presents no basis for reversal.

3. Finally, Babbitt argues that the evidence was insufficient such that the trial court should have found that the guilty verdict was against the weight of evidence and granted a new trial. Based on the facts as stated above and our holdings in Divisions 1 and 2 supra, this enumeration is without merit. The evidence was sufficient to enable a rational trier of fact to find Babbitt guilty beyond a reasonable doubt of the crimes for which he was convicted.[18]

*Judgment affirmed. Andrews, P. J. and Ray, J., concur.*

---

[18] (Punctuation omitted.) See *Artis*, 299 Ga. App. at 293 (5). See also *Jackson*, 443 U. S. at 319 (III) (B).